*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CM-0736

C. WILSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2024-DVM-000331)

(Heidi M. Pasichow, *Judge*)

(Submitted December 11, 2025                Decided July 9, 2026)

*Thomas G. Burgess* was on the briefs for appellant.

*Edward R. Martin, Jr.*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Mark Hobel*, *Nicole Webbert*, and *Megan Abrameit*, Assistant United States Attorneys, were on the brief for appellee.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: C. Wilson was charged with attempted second-degree cruelty to children after his seven-year-old son, C.W., showed up to school with significant red marks on his upper left arm and told school staff that his "dad

did it."[1] Mr. Wilson argued in his defense that he used "reasonable parental discipline" after C.W. and his sister were caught stealing $40 from Mr. Wilson's dresser, with C.W. keeping $20 of it.

The trial court heard evidence about three potential ways those marks may have been inflicted: (1) Ms. Wilson—C.W.'s mother and Mr. Wilson's wife—testified for the defense that Mr. Wilson "popped" C.W. twice with a belt, though she insisted both strikes were "[o]n his bottom" and in her view they were not "excessive"; (2) she further testified that C.W. tried to "squirm" away after the first "pop" and Mr. Wilson "grabbed [C.W.'s] arm" as he tried to leave and "pull[ed] him [back] with his hand"; and (3) C.W.'s teacher and a responding officer on the day of the incident testified that C.W. said his father struck him with a "white plastic bat," though C.W. did not testify and the bat was not further described or introduced into evidence (Mr. Wilson told an investigating officer that they had a white plastic bat in their apartment). After hearing the evidence, the trial court was unable to make any finding as to what caused C.W.'s injury. The court nonetheless found Mr. Wilson guilty, reasoning that while it was "clear" that Mr. Wilson was acting with a

---

[1] We have sua sponte recaptioned this case using Mr. Wilson's first initial and avoid using his first name in this opinion because Mr. Wilson and his son share a distinctive first name, making this step necessary to protect C.W.'s identity. *See generally* D.C. App. I.O.P. VIII.F.8 (calling for the use of initials to protect the identity of minors in sensitive cases).

"genuine" disciplinary purpose, the red marks on C.W.'s upper left arm demonstrated that the discipline was unreasonable, no matter how they were inflicted.

Mr. Wilson now appeals and argues that the evidence was insufficient to defeat the reasonable parental discipline defense and sustain his conviction. We agree. Three factors are critical to our assessment: (1) it is undisputed that Mr. Wilson acted with a permissible disciplinary purpose, and so the burden was on the government to prove beyond a reasonable doubt that the discipline he administered was outside the wide bounds our precedents provide for parental discipline, including for corporal punishment; (2) there was no evidence that C.W.'s arm was swollen, that the red marks persisted beyond the morning of the incident, or that C.W. required any medical intervention beyond the school nurse giving him some ice; and (3) the trial court could not draw any conclusion about what caused the red marks. The photographic evidence of temporary marks, severe as they appeared to be, simply does not establish that Mr. Wilson exceeded the bounds of reasonable parental discipline in these circumstances, absent any finding about how they were caused. We thus reverse Mr. Wilson's conviction.

## I. Facts and Procedural Background

We recount the facts in the light most favorable to the verdict, as that is how we view them in evaluating a challenge to the sufficiency of the evidence. *Johnson v. United States*, 207 A.3d 606, 611 (D.C. 2019).

### *The investigation*

C.W. arrived at school one morning after his mother, Ms. Wilson, dropped him and his older sister off. C.W. was seven years old, and his sister, Z.W., was ten years old. C.W.'s first grade teacher, Kehinde Dosunmu, described C.W. as a "rambunctious" and "fun" kid, who was "a typical first grader" but "behind a little bit" in class. That morning, she noticed C.W. rubbing his left arm and saw what she described as a "large and red" "bruise" spanning his upper arm—"from like near the shoulder down and close to his elbow." She opined that the "discoloration" on C.W.'s arm "seemed to cause him discomfort." While it was "normal for young children to have some . . . scrapes and bruises"—and she had seen some bruises on C.W. before—this one was more severe than what she had previously seen on him. Dosunmu asked C.W. what happened and he replied, "very matter of fact," that his "dad did it."

Dosunmu took C.W. to the nurse's office, and when the nurse asked him what happened, C.W. repeated, "my dad did it." After some follow-up questioning, C.W. "said it was a bat." Dosunmu went to the school social worker's office where she called the Children and Family Services Agency, or CFSA, and CFSA referred the matter to the police. Detective LiNida Bines came to the school to investigate. She spoke with school staff and C.W., who said that his dad hit him with a "white plastic bat." Bines described "purple and reddish and blue marks" "all the way up and down" C.W.'s left arm.

At some point that morning—though it is unclear precisely when—somebody took pictures of C.W.'s left arm, and those pictures were later introduced at trial as Government Exhibits 1-3. We have included those exhibits as an appendix to this opinion, with some cropping to the first picture to omit C.W.'s face (he was smiling in it).[2] The pictures depict red marks running along C.W.'s upper left arm, between the shoulder and the elbow. The marks appear most severe in the first photo (Exh.

---

[2] We initially granted the government's motion to file these exhibits under seal because they "contain sensitive photographs of a minor." By omitting C.W.'s face in the one exhibit in which it had appeared, we are satisfied that the photographs are no longer so sensitive as to merit sealing, and we unseal them in the form they appear in the Appendix. The government likewise included a cropped version of its Exhibit 1 with C.W.'s face omitted in the publicly filed version of its opening brief, without objection or suggestion from any party that that brief be sealed or redacted to omit that cropped photograph.

1), least severe in the second (Exh. 2), and somewhere in between in the third (Exh. 3). Whatever accounts for the appreciable discrepancies in the pictures—perhaps different lighting or some passage of time between when the photos were taken—all of the photos show red marks spanning C.W.'s upper left arm.

Bines then went to the Wilsons' apartment to investigate, arriving around noon or 1pm that same day. Mr. Wilson discussed what happened that morning and told Bines that some money had gone missing from the house and that $20 of it was still missing. He said he had physically disciplined both C.W. and his sister, Z.W., with a belt. Bines did not observe any marks on Z.W., though it is not clear when she observed Z.W., be it at school that morning or later in the day at the apartment. Bines also asked Mr. Wilson whether they had a white plastic bat in the apartment and he said that they did, although Bines never saw it. Bines ultimately arrested Mr. Wilson, opining at trial that "any marks or bruises" resulting from "physical discipline crosses a line to being abuse . . . [a]ccording to law."

*The trial and the underlying incident*

The government rested its case after Dosunmu and Bines testified to the facts just recounted. It did not call C.W., Z.W., Ms. Wilson, or any other percipient witness to the underlying theft or ensuing discipline. It did not elicit any evidence of prior abuse or concerns of abuse in the home, nor was there evidence of prior CFSA

involvement with any of the Wilsons' five children—Ms. Wilson described Z.W. as her "middle child," suggesting she had two children older than her, and two children younger than her, including C.W. Mr. Wilson moved for a judgment of acquittal at the close of the government's case, arguing that the government had made a "blanket conclusion" that he could be convicted "just because marks appeared on [C.W.'s] arm." The court denied the motion, echoing Bines's opinion that "there is case law that indicates that if there's force that's hard enough to leave bruising and marks on a child's body, that that seems to be beyond reasonable parental discipline."

Mr. Wilson then called Ms. Wilson as the sole witness in his defense. Ms. Wilson explained that, on the morning of the incident, she noticed that Z.W. was acting suspiciously—she was holding her bookbag close rather than putting it by the door, as she typically did. Mr. and Ms. Wilson suspected Z.W. was hiding something in her bag, and Mr. Wilson then looked in Z.W.'s bag and found $20. Z.W. at first claimed it was her money, but ultimately said that she took $40 from her parents' dresser and gave $20 to C.W. Ms. Wilson testified that C.W. immediately started crying and admitted to having the $20. While Z.W. "stated that she" took the money and gave $20 to C.W., Ms. Wilson made clear that she had serious doubts about whether C.W. had a more direct hand in the theft: "[Z.W.] stated that she gave it to him. It was never . . . a fact."

Ms. Wilson testified that she then saw Mr. Wilson "pop" both Z.W. and C.W. with a belt on their bottoms—two times each—while their clothes were on. Mr. Wilson held the belt in a "loop," with "the belt buckle and the end of the belt in his hand." The first time Mr. Wilson popped C.W., C.W. tried to "squirm" away and Mr. Wilson "grabbed him" by the arm and pulled him back. Afterward, Mr. and Ms. Wilson explained to their children "[t]hat it's not okay to steal because [their] dad works" and every week he gives his children "$50 each" so "there was no need for them to steal." Ms. Wilson then took the kids to school. She saw no marks when they left the house and C.W. was not complaining of any pain. She also said that C.W. "didn't have those marks" when he came home from school that day. Ms. Wilson described C.W. as "hyperactive," noting that he had been "diagnosed with ADHD," and further said he was an active kid who played football and frequently had bruises and scrapes.

Ms. Wilson emphasized how tirelessly she and Mr. Wilson worked to keep each of their five children safe and out of trouble. She explained that they "don't live in the best neighborhood," and that "a three-year-old just got killed, and then two more people got killed up the street" from where they lived. She elaborated that she and Mr. Wilson "don't have [the kids] in the neighborhood" except to play sports: "[W]e have to take them out to Virginia and stuff like that so that our kids can be safe." The Wilsons lived in Southeast D.C., near the Maryland border, and drove

their children "30 minutes out [of the] way" to attend school in Capitol Hill, "just so they can go to a better school." Ms. Wilson felt "betray[ed]" by the prosecution given how hard they worked as parents to "encourage [their kids] to do better, to be better," noting that Mr. Wilson had lost his job as a special police officer because of the pending charge. "[E]very day," she continued, "[we're] looking at the news and we're seeing 11-year-olds out here just robbing people and stealing cars. We don't want that for our son."

*The court's findings*

After closing arguments, the court ruled from the bench. The court considered C.W.'s age and mental development, noting that he was seven years old and had received some "extra attention" in school. The court emphasized that there was no testimony about any other misconduct by C.W.—he had simply "accepted a $20 bill from his sister." The court continued: "I mean, it wasn't even like he was the one who took it from the bedroom."

Critically, the court was unable to make a finding about how the red marks were inflicted on C.W.'s arm—whether Mr. Wilson used a belt, his hands, or a plastic bat. The court opined that this did "not look like a one-grab case" or a "squeeze where you can actually maybe see a difference between a thumb and a pinky." But "[w]hatever" caused the red marks, the court concluded that "it created

a very significant response," so that the discipline was beyond what was "reasonable under these circumstances." The court thus found Mr. Wilson guilty of attempted second-degree cruelty to children, though it imposed a suspended sentence of sixty days so that Mr. Wilson would not have to serve any jail time.

Mr. Wilson now appeals his conviction.

## II. Analysis

Mr. Wilson argues that there was insufficient evidence to convict him of attempted second-degree cruelty to children because the evidence did not prove beyond a reasonable doubt that he acted outside the bounds of permissible "parental discipline," as our case law has outlined it. *See generally Lee v. United States*, 831 A.2d 378, 380-81 (D.C. 2003). We review sufficiency challenges de novo and, subject to one caveat, we (1) view the evidence in the light most favorable to the verdict, *Johnson*, 207 A.3d at 611; and (2) then ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The caveat—important in this case given the trial court's uncertainty about how the red marks on C.W.'s arms were inflicted—is that when we evaluate the

sufficiency of evidence at a bench trial, we must be mindful that "the trial court's refusal to resolve [certain] factual dispute[s] means the trial judge had a reasonable doubt" about them. *See Cave v. United States*, 75 A.3d 145, 147 (D.C. 2013). That is, even if the testimony "*if credited* would have been sufficient to convict," we must accept the trial court's findings, *id.*, and in this case that means we must harbor the trial court's same doubts as to how C.W.'s injuries were inflicted.

We begin by outlining our case law on the parental discipline defense, and then we apply those precedents to the record before us.

*A. Reasonable parental discipline*

A person commits second-degree cruelty to children if he "intentionally, knowingly, or recklessly" "[m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child." D.C. Code § 22-1101(b)(1).[3] When a parent is charged with child cruelty, however, it is a complete defense to the charge if (1) the force was used for "the purpose of exercising parental discipline" and (2) the

---

[3] Mr. Wilson was charged with and convicted of *attempted* second-degree child cruelty under D.C. Code § 22-1803, though no party suggests that is of any importance here. If the government proves that a defendant committed second-degree child cruelty, then it has likewise proven the attempt to do so. *See Smith v. United States*, 813 A.2d 216, 218-19 (D.C. 2002). And the government does not argue that it has proven attempted second-degree child cruelty if it has not proven the completed offense.

force was reasonable. *Lee*, 831 A.2d at 380-81. Once the defense is fairly raised, the government has the burden of proving, beyond a reasonable doubt, either that the parent's purpose was not disciplinary or that the force used was unreasonable. *Johnson*, 207 A.3d at 612. Only the second prong of that test is at issue here, because there is no dispute that Mr. Wilson acted with a genuine and permissible disciplinary purpose when punishing C.W. on the morning in question.

In this jurisdiction, our law starts from the premise that parents may use some amount of corporal punishment to discipline their children. "This is not a jurisdiction where physical discipline of children is outlawed; what the law requires is that physical force, if used, must be reasonable and for the purpose of discipline." *Florence v. United States*, 906 A.2d 889, 894 (D.C. 2006); *but cf.* D.C. Code § 16-2301(23)(B)(i) (listing acts that cannot constitute reasonable discipline, including "burning, biting, or cutting a child," and "striking a child with a closed fist"). Our longstanding "recognition of the parental discipline defense means that the court cannot second-guess a parent's choice of discipline," including corporal punishment, "as long as [it is] not excessive." *Florence*, 906 A.2d at 894. Indeed, it understates the deference we owe to parental disciplinary choices to say that the question for a factfinder when assessing the parental discipline defense is whether disciplinary force was "reasonable" or "excessive." Of course, many rational factfinders would find any corporal punishment unreasonable, or any intentional

physical infliction of pain for disciplinary purposes to be excessive. Our precedents squarely foreclose those views, however. The parental discipline defense is better captured as requiring a factfinder to assess whether the discipline was so far outside the bounds of reasonable discipline that, despite this jurisdiction's tolerance of corporal punishment more generally, it could only be deemed as excessive in light of the totality of circumstances.

In evaluating whether the force used is so excessive and unreasonable to satisfy that test, our courts consider all the circumstances, including "the child's age, health, mental and emotional development, alleged misconduct on this and earlier occasions, the kind of punishment used, the nature and location of the injuries inflicted, and any other evidence that [may be] relevant." *Lee*, 831 A.2d at 381 (citation omitted). But we must always be mindful that parents have a "constitutionally recognized 'fundamental right . . . to make decisions concerning the care, custody and control of their children.'" *W.H. v. D.W.*, 78 A.3d 327, 341 (D.C. 2013) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion)).

At the outset, we correct one legal misunderstanding that both the trial court and the arresting officer articulated: it is not the case, as the trial court put it, that "force that's hard enough to leave bruising and marks on a child's body" is "beyond

reasonable parental discipline." Our precedents are decidedly to the contrary, as evidenced by a trio of cases that we now discuss.

First is *Florence*, where this court reversed a conviction for attempted second-degree cruelty to children after a mother repeatedly struck her eleven-year-old daughter on her leg and hands with an unheated curling iron. 906 A.2d at 891. That beating was prompted by the daughter's "disobedien[ce]" and "belligeren[ce]," and it left the daughter's hand visibly "swollen"—she was taken to the hospital and "given an ace bandage and an ice pack for her hand." *Id.* We acknowledged "that on the face of it, without amplifying the evidence, a trial judge could find that a parent's hitting an eleven year-old child with a curling iron is unreasonable." *Id.* at 895. But given the "child's size and belligerence"—the daughter was 269 pounds and "much bigger" than her mother—we could "not say that the government ha[d] proved beyond a reasonable doubt that appellant's use of the curling iron was unreasonable." *Id.* at 890 n.2, 895.[4] More importantly for present purposes, the visible swelling of the daughter's hand did not alter that calculus: we explained in

---

[4] As the government stresses, C.W. was not so large as to pose a physical threat to Mr. Wilson, unlike the daughter in *Florence*. 906 A.2d at 895. But then again, we treated that fact as justifying the mother's use of a curling iron in *Florence*, and here we have no finding that Mr. Wilson used any implement at all when inflicting the red marks on C.W.'s arm. And regardless, *Florence* clearly refutes the idea that our law categorically prohibits parents from using physical force that leaves marks on their children.

terms roughly applicable here that "[n]o evidence was presented that [the daughter's] hand, though swollen, was *seriously* injured." *Id.* at 895 (emphasis added). And since *Florence* we have stressed that "[e]xposure to a substantial risk of *significant physical injury* or *significant pain* may also be relevant in determining whether a parent used excessive force under the circumstances,"[5] *Longus v. United States*, 935 A.2d 1108, 1112-13 (D.C. 2007) (emphasis added), suggesting that mere transient marks lasting some hours do not come close to establishing that the underlying discipline was unreasonable.

Second, consider *In re L.H.*, arising from a neglect proceeding in which a mother slapped her teenage daughter in the face and threw her to the floor after discovering a website where the daughter had posted "multiple pictures of [herself] scantily clad." 925 A.2d 579, 581 (D.C. 2007). The following day, a CFSA employee visited the home and noticed "discoloration on a certain part of [the daughter's] forearm, indicating some type of surface trauma to the skin." *Id.* The trial court determined that the mother had abused the daughter based largely on that evidence, and we reversed. *Id.* We explained that "[n]o evidence suggested that" the daughter

---

[5] There was no evidence that C.W. was in significant pain after the discipline here. His teacher testified only that the "discoloration" she saw on his arm "seemed to cause him discomfort." C.W. was otherwise "very matter of fact" about the marks and smiling in the one photograph taken shortly after the incident that depicts his facial expression.

suffered injuries "beyond minor temporary marks"—despite their persistence into the following day—and "the legislature has expressly required injury greater than that before a parent exercising discipline may be found to have abused her child by a single act of corporal punishment." *Id.* (referencing D.C. Code § 16-2301(30), defining "physical injury" in the child neglect context as "bodily harm greater than transient pain or minor temporary marks").[6]

Third, in *Powell v. United States*, a father forbade his sixteen-year-old daughter from leaving the house after she said she was going to a friend's house where the father "suspected unlawful drug activity." 916 A.2d 890, 892 (D.C. 2006).

---

[6] *In re L.H.* arose in the civil neglect context—it was not a criminal case—but we have often looked to our civil neglect law when considering the contours of the parental discipline defense. *See, e.g.*, *Florence*, 906 A.2d at 894; *Newby v. United States*, 797 A.2d 1233, 1244 (D.C. 2002). And this difference cuts in Mr. Wilson's favor rather than against him: our civil neglect statute is interpreted "liberally" to protect children, and the government need only prove abuse by a "preponderance" of the evidence. *In re S.G.*, 581 A.2d 771, 774, 778 (D.C. 1990). In the criminal context, there is no principle of liberally interpreting the law against the accused—the "rule of lenity" directs the opposite, at least when faced with grievous ambiguity, *see In re D.T.*, 977 A.2d 346, 355 (D.C. 2009)—and the government must satisfy the far more daunting "beyond a reasonable doubt" standard. It stands to reason, at least as a general matter, that if parental discipline that causes physical injury would not amount to abuse even in the civil neglect context, it does not amount to child cruelty and unreasonable parental discipline in the criminal context. *Cf. Longus*, 935 A.2d at 1113 (Farrell, J., concurring) (reasoning that "the evidence does not permit a reasonable inference that the force [the appellant] administered was so excessive as to overcome the parental defense," particularly in light of the fact that "this was not a civil neglect case but a criminal prosecution").

When the daughter tried to leave nonetheless, the father "grabbed" her "right arm and pulled her" back inside "with sufficient force that she fell backwards against a nearby interior stairway." *Id.* A more extended fight ensued, and the daughter was left with a bruise on her right arm that persisted at least into the following day, plus additional injuries to her face and back. *See id.* (noting that the daughter was examined at the hospital "the following night"). The father was convicted of simple assault based on that initial incident at the front door only, and we reversed that conviction in light of the parental discipline defense. *Id.* at 893. We noted that "[t]o resolve, beyond a reasonable doubt, that the force used by appellant was excessive is overly speculative given the circumstances." *Id.* at 895.

We understand *Powell* to mean that the bruises to the daughter's arm did not carry substantial weight in our assessment of whether the father acted within the bounds of reasonable parental discipline when he forcefully grabbed his daughter by the arm and caused her to fall backward into the stairway. The concurring opinion in *Powell* emphasized that point. *Id.* at 895 (Glickman, J., concurring) (highlighting that "[t]here was no evidence that" the daughter "sustained *significant* physical injury or significant pain" during that initial altercation, and "apparently, she did not") (emphasis added). With that said, we acknowledge that *Powell*'s reasoning is not entirely clear. We opined that the insufficiency of the government's evidence stemmed at least partially from the uncertainty about "how and when [the daughter]

sustained her injuries"—whether it was in that initial altercation or in the ensuing fight, though it is not entirely clear why that mattered to anything. *Id.* at 893. Still, it appears that this uncertainty primarily concerned the daughter's face and back injuries, as the father's forceful grab of her right arm during the initial altercation at the front door was the only obvious candidate for what caused the bruises on that very arm. *Id.* at 892.

In contrast to that trio of cases, we have upheld findings that force was outside the bounds of reasonable parental discipline in cases where the injuries were far more extensive, and inflicted with more dangerous instruments, than anything we have evidence of here. *See, e.g.*, *Lee*, 831 A.2d at 378; *Johnson*, 207 A.3d at 612. In *Lee*, a mother beat her sixteen-year-old daughter with a large wooden dowel "from which clothes are hung in a closet" after the daughter missed an important event. 831 A.2d at 380 & n.2. She repeatedly struck her daughter's shoulders and legs, and the daughter went to the emergency room for treatment of the various contusions and abrasions on her body. *Id.* Similarly, in *Johnson*, a mother beat her thirteen-year-old son with a large stick about the size of a broomstick after he "broke into her room" to retrieve a Kindle she had confiscated. 207 A.3d at 609. She hit her son "indiscriminately" and hard enough for the stick to break, and she persisted repeatedly beating him even after it broke. *Id.* at 612. As a result, he had bruises all over his arms, shoulder, and legs, plus "a mark on his left ear." *Id.* In both cases, we

determined that the evidence was sufficient to prove that the parents had used unreasonable force in light of the injuries sustained, the particular object that was used to inflict those injuries, and the uncontrolled nature of the beatings.

While there is no magic formula for determining when disciplinary force is excessive, it is clear from our precedents, contrary to the trial court's reasoning, that leaving bruises or marks on a child's body does not by itself obviate the reasonable parental discipline defense. The severity of the injuries is highly relevant to the calculus, but short-lived red marks or bruises do not—standing alone, and without regard to how they were inflicted—supply so much as an inference that the corporal punishment exceeded the bounds of reasonable discipline under our precedents.

*B. There was insufficient evidence that Mr. Wilson's discipline was unreasonable*

Turning back to the facts of this case, we conclude that the evidence was insufficient to establish beyond a reasonable doubt that Mr. Wilson acted outside the wide leeway this jurisdiction gives to reasonable parental discipline. First, while the government relies primarily on the severity of the red marks on C.W.'s arm, there was no evidence that those marks lasted more than a couple of hours. The government did not call any percipient witness or expert to elucidate their duration or likely duration. Second, the trial court made no finding about how those marks were inflicted, given the various conflicting possibilities that each had some support

in the evidence. Third, the court severely understated the seriousness of C.W.'s theft and thereby downplayed the justification for his discipline—his parents' plainly reasonable concern about where his behavior might lead. We address each of these points in turn.

First, there was no evidence that the red marks on C.W.'s arm were anything but short-lived, nor was there evidence that they were accompanied by swelling, significant pain, or any other injuries. Instead, all we have are three photos and testimony that the marks were no longer visible by the time C.W. returned home from school. We acknowledge that the photos are upsetting, as they show serious red marks running the length of C.W.'s upper arm. *See* Appendix. One might naturally suppose that those marks were quite likely to progress into bruising that lasted for some days.[7] But absent some medical or other evidence to that effect, we do not think that is an inference one can draw with any confidence from the pictures alone. "Res ipsa loquitur is not a doctrine in the criminal law." *Ross v. United States*, 331 A.3d 220, 222 (D.C. 2025). As we have elucidated in our child neglect case law,

---

[7] That is not to suggest that protracted marks or bruising would suffice to defeat the reasonable parental discipline defense. But the more serious the injuries are, the harder it is for the parental discipline defense to succeed. *See, e.g.*, *Johnson*, 207 A.3d at 612 (comparing the "repeated[], forceful[], and indiscriminate[] beat[ing']" there to the "measured" discipline in *Florence* that caused "no other injury" but a "swollen" hand).

*see supra* n.6, mere discoloration and "surface trauma to the skin," absent any information about its "nature or extent," does not amount to a "physical injury" at all. *In re L.H.*, 925 A.2d at 580-81 (discoloration on arm that persisted into the following day was not a "physical injury"); *cf. In re H.R.*, 206 A.3d 884, 888 (D.C. 2019) (finding that "'purplish-red, curved scratch and bruising along [child's] upper cheek bone, under her right eye,' that did not heal for approximately three days," went beyond mere "transient pain or minor temporary marks" and thus amounted to a "physical injury").

Second, the trial court made no finding about how these marks were inflicted—whether they were caused by a belt, by a forceful grab and pull, as Ms. Wilson's testimony suggested, or by a white plastic bat, as some admitted hearsay suggested. The trial court at one point opined that C.W.'s red marks did "not *look like* a one-grab case," but it is not clear to us that the court was entirely ruling out that the forceful grab Ms. Wilson testified to left this mark. Regardless, even if the court had ruled out a mere grab and forceful pull, it clearly erred as it had no sound basis for doing so.[8] The court's stated rationale for discounting the likelihood that

---

[8] The trial court also at one point opined that "there seems to be the admission, at least through [Ms. Wilson], that [Mr. Wilson] was using a belt folded over twice." If the trial court meant that Ms. Wilson admitted that Mr. Wilson hit C.W. on his arm with a belt, that was clear error—Ms. Wilson was clear that Mr. Wilson struck

these red marks were caused by a forceful grab and pull is that one could not "see a difference between a thumb and a pinky" on C.W.'s arm.

But that reasoning suffers from three infirmities: (1) there was no evidence that one would expect a forceful grab to leave visible finger marks; (2) the photographic evidence showed only the top side of C.W.'s arm, and not the underside where one would more naturally expect an adult's fingers to meet when grabbing a child's arm; and (3) the fairly uniform red marks spanning C.W.'s upper arm do not seem to be any more consistent with a targeted strike with a belt or a bat. Just as the red marks do not show any telltale signs of a grab, like fingerprints, neither do they bear any telltale signs of strikes with a belt or a plastic bat: there is no focal point of impact, no linear, looped, or buckle-shaped mark from a belt, and no tramline bruising as one might expect from a strike with a bat. If the absence of finger marks on the top side of C.W.'s arm weighs against a forceful grab, the absence of any markings indicative of a belt or bat strike weighs equally against the alternative potential mechanisms of injury. The redness is diffuse and nonspecific, with no evidence whatsoever elucidating its likely cause based on its appearance alone. In short, no rational factfinder could draw any conclusion about the

---

C.W. with a belt twice on the "bottom." And while we attach no significance to the trial court's inartful phrasing on this point, Ms. Wilson also stated that the belt was folded over once, not twice, in a "loop."

mechanism of the injury based on the red marks in the photographs alone, and common sense cannot substitute for the complete lack of evidence on bruising or discoloration patterns. *See Ross*, 331 A.3d at 225 ("[I]nferences and common sense cannot serve as substitutes for evidence.").

Third, in our view the trial court seriously understated the severity of the transgression that led to C.W.'s discipline in two important respects. For starters, while stealing $20 might seem like a trivial thing to some, Ms. Wilson gave powerful and compelling testimony about why she and Mr. Wilson took C.W.'s transgression so seriously. If left uncorrected, seven-year-olds brazenly stealing $20 from their parents can become "11-year-olds out here just robbing people and stealing cars," as Ms. Wilson worried about and testified to experiencing in her neighborhood. The trial court did not mention or cast any doubt upon the well-founded reasons that Mr. and Ms. Wilson had for treating the theft as a serious offense, and our courts owe considerable "deference and . . . protection" to parents' "important interest" in the "management of [their] children." *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981) (citations omitted). Next, the trial court also had no sound basis to conclude that "it wasn't even like [C.W.] was the one who took it from the bedroom," where no witness to the theft testified about who took the money, and Z.W.'s out-of-court "admission" to having done it could just as readily be understood as an older sister taking the heat and trying to protect her younger brother

from the repercussions of his actions (as Ms. Wilson seemed to believe). In any event, C.W. started crying immediately when his parents learned that he had the $20 in his possession, indicating at the very least that he knew the money he possessed was stolen from his parents and he kept it anyway.

Parents have the right to reasonably discipline their children, and this court's precedents give considerable breadth to the scope of that right. Where the evidence here did not demonstrate that the red marks were anything but fleeting, and the cause of C.W.'s injury was uncertain and includes the possibility of Mr. Wilson forcefully grabbing and tugging him by the arm in response to a serious transgression, no rational factfinder could conclude beyond a reasonable doubt that the discipline exceeded the wide bounds that our precedents have drawn for reasonable parental discipline.[9]

---

[9] Mr. Wilson raises a second claim of error that we do not resolve: he claims that the trial court reversibly erred when it found that C.W. "was treated very, very carefully because of the challenges that he had," when in fact the evidence showed only that C.W. had ADHD and received some individualized attention at school because he was "behind a little bit" in class. We agree with the thrust of the argument—the evidence portrayed C.W. as a generally happy and well-adjusted child with modest and rather run-of-the-mill scholastic challenges—though we doubt the trial court's descriptions are "clear error" independently warranting reversal, as Mr. Wilson urges. In either event, we do not attach any serious weight to C.W.'s ADHD or mild scholastic challenges, as it is not at all clear which way they cut. A parent with a "rambunctious" child prone to impulsivity like C.W. would

### III. Conclusion

For the foregoing reasons, we reverse Mr. Wilson's conviction.

*So ordered.*

---

seem to have heightened reason to nip their misconduct in the bud to avoid the bad outcomes that might otherwise follow in their adult life, rather than any reason to go easier on them. It suffices to say that, on this record, we do not think a reasonable factfinder could attach any serious weight to C.W.'s ADHD and run-of-the-mill scholastic challenges, so we generally discount this consideration as immaterial in this case.

# Appendix
## (Gov't Exhibits 1-3)



Viewed by NWebbert (usaodc.us.evidence.com) on 22 Jul 20
24



Viewed by NWebbert (usaodc.us.evidence.com) on 22 Jul 2024


Viewed by NWebbert (usaodc.us.evidence.com) on 22 Jul 2024